O’SCANNLAIN, Circuit Judge,
dissenting:
The court orders Hunt’s sentence effectively reduced from fifteen years to time served because the trial judge who took his guilty plea failed to seek an explicit admission that Hunt knew that the illegal drug he ordered, picked up, and possessed was cocaine. In my view, this error was harmless in light of the overwhelming and uncontroverted evidence that Hunt knew exactly what he was doing.
The majority does not really dispute this. Instead, it promulgates a new rule for this circuit, essentially eliminating harmless error review of Apprendi violations. Because of such unwarranted change in our sentencing jurisprudence, I must respectfully dissent.
I
A
In January 2004, the Anchorage Police Department received information that a man named “Stacy” was trafficking cocaine into Alaska by hiding it in candles. Later, law enforcement officers intercepted a package at the Anchorage airport which contained 1.2 kilograms of cocaine hidden inside candles. A controlled delivery was executed at the address listed on the package. A woman signed for the package and put it in the trunk of a car. Police then saw the defendant, Stacy Hunt, remove the package from the trunk of the car and leave with it in a Ford Explorer. The police stopped the Explorer, seized the cocaine, and arrested Hunt.
Hunt admitted to police that he ordered the cocaine and paid the woman $400 to sign for the package and to leave it for him in the trunk of the car. He then wrote a confession with his own hand stating that “Kisha called me ... to pick up [the] package,” “my understanding is that Kisha would be paid $400,” and a “package of 1 Kilo of coke was to be put in burgundy Mercedes S.U.V.”
B
A federal indictment alleged that Hunt “knowingly and intentionally attempted] to possess with intent to distribute a controlled substance, to wit: 500 grams or more of a mixture and substance containing cocaine,” in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. Hunt appeared in federal court to plead guilty to the sole count in the indictment. The judge asked the Assistant United States Attorney (AUSA) to state the elements of the crime to which Hunt was pleading guilty. The AUSA stated that “the elements would be that on or about January 26th of 2004, Mr. Hunt attempted to possess a parcel that contained a little over a kilogram of cocaine ... and that he did so knowingly.” The court then asked Hunt if he understood what the government would have to prove in order to obtain a conviction, and Hunt said, “Yes.” “And you’ve discussed all this with your attorney?” the court asked. Again, Hunt said, “Tes.” The AUSA then interrupted, noting that he forgot an element, namely, “that Mr. Hunt *918 attempted to possess that cocaine with the intent to distribute it.” “Do you understand that additional element?” asked the court. Again, Hunt replied, “Yes, I do.”
At this point, the court added a casual phrase in a simple follow up question which, as it turns out, effectively knocks fourteen years off Hunt’s sentence. The judge said: “So you attempted to possess cocaine, you knew it was cocaine or some illegal drug, and you did it with the intent to distribute. I guess those are the three elements, okay?” (emphasis added). Hunt responded, “[T]o those elements, yes, I agree.” Hunt then asked, “Could you give me those elements once again?” The court directed the AUSA to state the elements again, and he said “that Mr. Hunt attempted to possess a parcel which contained a little over a kilogram of cocaine .... We’d have to prove that Mr. Hunt’s attempt to possess that cocaine was done knowingly and then we’d have to prove that he intended to distribute that cocaine.” “Got it?” the court asked. “Okay, yes,” replied Hunt. “Yes, I understand those elements,” Hunt continued, “As far as the specific amount, I don’t have personal knowledge of it as I never opened the package and weighed it, but I do accept responsibility for whatever was in it.” Deeming this sufficient, the court accepted Hunt’s guilty plea.
C
The district court sentenced Hunt for attempting to possess an unspecified amount of cocaine, pursuant to 21 U.S.C. § 841(b)(1)(B), which carries a statutory maximum of twenty years’ imprisonment. The district court determined the base offense level was twenty-six and departed upward from a criminal history category of IV to one of VI to reach a Guidelines range of 120 to 150 months. The court then imposed an above-guidelines sentence of 180 months. Both the upgrade in the defendant’s criminal history category and the upward departure in reaching the ultimate sentence of fifteen years were driven by Hunt’s extensive criminal history. As the district court put it, Hunt has led a life “consumed with criminal activity.”
This was no exaggeration. In 1984, when Hunt was just seventeen, he attacked a woman on the street, dragged her into a stairwell, and attempted to rape her. The police found Hunt exposed and on top of the woman, who was crying and pleading with him to stop. Hunt’s punches left her with a bleeding mouth, a bruised face, and scratches on her neck. To avoid responsibility, Hunt told the police that the woman was a prostitute and was attempting to rob him. Hunt was convicted of attempted rape but, due to his age, received no jail time. Four years later, Hunt was arrested for sexual assault again. This time, he was accused of kidnapping a woman outside her home at gunpoint, forcing her into his car, driving her to a park, and raping her. Hunt’s defense, again, was that the woman was a prostitute. No charges were filed.
A month later, in October 1988, Hunt, along with four others claiming to be members of “the Disciples,” severely beat and threatened to kill a man who had refused to give them the case of beer he was carrying. Although Hunt was arrested for robbery, the case was dismissed, in part because the victim could no longer be located. In 1989, Hunt was convicted of selling cocaine, for which he received a one-year sentence.
In 1991, Hunt participated in the kidnapping and murder of a rival drug dealer. Hunt claimed that his co-defendants forced him to participate in the killing, a story which prosecutors apparently believed because they arranged for him to receive a three-year sentence, suspended for twelve months, in exchange for his cooperation. In 1993, Hunt was again convicted of drug possession, jailed for ninety days, and put *919 on probation for three years, which he violated, causing him to serve ninety more days. Within a year of his release, Hunt violated his probation once again, this time by firing a gun in a nightclub in May 1994. Hunt was sentenced to two years in jail when he was finally convicted of this crime, after failing to appear in the original proceedings.
Just eight days after the nightclub incident, in June 1994, Hunt committed “battery with serious injury and a deadly weapon,” by brutally beating his ex-girlfriend with a wooden baby cradle, and leaving her with a number of injuries, including a gash that required twenty stitches to close. He was sentenced to six years in prison. (At the same time, he was also charged with kidnapping, sexual battery, and forced oral sex, but not convicted.) Hunt went to jail for these crimes in 1996, but he was released on parole after two years, only to violate his parole three months later by testing positive for cocaine. He was arrested for another parole violation in 1999 and sentenced to six more months in jail. He violated parole once again in February 2000, for which he was not arrested until 2007.
Hunt was arrested on the current charges in 2004, but absconded to California after being released from police custody. It was not until December 2007, when he was arrested in California for beating up another women, that Hunt was finally returned to Alaska to face charges in the instant case.
Based on this vicious criminal history, the district court determined that a fifteen year sentence was necessary to “protect the public from further crimes of the defendant.” 18 U.S.C. § 3553(a)(2)(C). The court added that, while Hunt’s intelligence and charisma may have enabled him to avoid taking significant responsibility for his actions in the past, it would not do so this time.
II
The majority correctly recites the Apprendi rule: “Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt,” Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), but goes astray thereafter. Assuming arguendo that the district court committed Apprendi error by finding intentional cocaine possession yet failing to obtain an explicit admission from Hunt that he knew the illegal drug he possessed was cocaine, our precedent requires us to determine whether such error was harmless. See United States v. Zepeda-Martinez, 470 F.3d 909, 910 (9th Cir.2006) (“Apprendi errors are reviewed for harmlessness.”). “[A]n error is harmless if the court finds beyond a reasonable doubt that the result ‘would have been the same absent the error.’ ” Id. at 913 (quoting Neder v. United States, 527 U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). The court may make such a finding where “the record contains ‘overwhelming’ and ‘uncontroverted’ evidence supporting” the omitted element. Id. (quoting Neder, 527 U.S. at 17-18, 119 S.Ct. 1827). Conversely, the error is not harmless if “the defendant contested the omitted element and raised evidence sufficient to support a contrary finding.” Neder, 527 U.S. at 19, 119 S.Ct. 1827. Where a court must determine whether an Apprendi error was harmless, its review “encompasses the whole record including the sentencing proceedings.” Zepeda-Martinez, 470 F.3d at 913 n.3 (internal quotation marks omitted). The purpose of this broad review is “to assist [the court] in determining what evidence the parties would have introduced at trial.” Id. (internal quotation marks omitted). Thus, if we conclude, beyond a rea *920 sonable doubt on the basis of the record, that a jury would have convicted Hunt of attempted possession of cocaine with intent to distribute, the Apprendi error is harmless and we must affirm.
A
Here, the record contains overwhelming and uncontroverted evidence that Hunt attempted to possess cocaine with the intent to distribute it. The police received a tip that a man named “Stacy” was importing cocaine into Alaska, hidden in candles. Later, they intercepted a package that arrived in Alaska containing just over a kilogram of cocaine hidden in candles. The police then executed a controlled delivery of the package at its intended address. Sure enough, the defendant — who, as predicted, is “a man named ‘Stacy’ ” — retrieved the package hours after it was delivered.[1]
If this were not enough to convince a jury that Hunt intended to possess cocaine, Hunt confessed as much to the police. Hunt admitted that he ordered the cocaine and paid a woman named Kisha $400 to sign for the package and leave it for him in the trunk of the car. He then wrote a confession with his own hand stating that “Kisha called me to pick up [the] package” and that his “understanding is that Kisha would be paid $400,” and that “package of 1 Kilo of coke was to be put in burgundy Mercedes S.U.V.” Hunt’s confession correctly recounted the amount of cocaine contained in the package (roughly a kilogram) and how the cocaine ended up in the trunk of the car: it was delivered to Kisha who signed for it, placed it in the car, and called Hunt to tell him it was ready for pick-up. This evidence of Hunt’s intent to possess cocaine is surely “overwhelming.” Zepeda-Martinez, 470 F.3d at 913.
Further, Hunt has not “controverted” this evidence, as he must to show that he suffered prejudice from the Apprendi error. See Zepeda-Martinez, 470 F.3d at 913. Nor could he. Hunt admits that he ordered the package and picked it up knowing it contained a controlled substance, but he would have the Court believe that he did not know which controlled substance he ordered and picked up. Surely it can be presumed, however, that drug dealers are not in the habit of giving each other more than they bargained for. It would therefore be absurd to suggest that Hunt&wkey;notwithstanding his confession to a “package of 1 Kilo of coke” — actually ordered a far less valuable illegal drug, such as marijuana, but the sender just decided (on his own) to mail cocaine instead, without informing Hunt or asking to be paid for the drug upgrade.
Moreover, if Hunt attempted to offer such an outlandish defense at trial, the government would likely be able to introduce Hunt’s string of drug convictions in order to show that Hunt was an experi *921 enced drug dealer who would have made a point to know exactly what drug he was receiving. See United States v. Vo, 413 F.3d 1010, 1018-19 (9th Cir.2005) (holding that the defendant’s prior drug conviction could be admitted to rebut his claim that he had no knowledge that a package he shipped contained methamphetamine because the “conviction tended to show that [he] was familiar with distribution of illegal drugs and that his actions in this case were not an accident or a mistake”); United States v. Howell, 231 F.3d 615, 628 (9th Cir.2000) (holding that defendant’s “prior convictions for possession ... with intent to deliver cocaine [were admissible] to show that [the defendant] knew that the substance in the bag was a narcotic”).
In sum, the only possible defense that is available to Hunt — that he received a free upgrade from marijuana to cocaine — is not one that “could rationally lead to a contrary finding with respect to the omitted element.” Neder, 527 U.S. at 19, 119 S.Ct. 1827. Indeed, the majority has not offered a single theory that a defense counsel could possibly have argued to a jury in summation. Accordingly, there can be no reasonable doubt that, absent the Apprendi error, the result — Hunt’s conviction for attempted possession of cocaine with the intent to distribute it — would have been the same.
B
The majority makes three efforts to avoid this conclusion, none of which withstand even passing scrutiny. First, the majority asserts that “Hunt’s denial of his intent in this case” — which is unaccompanied by any explanation of how he accidentally came into possession of a kilogram of cocaine — meets the requirement that the defendant show “ ‘evidence sufficient to support a contrary finding’ ” on the omitted element. Maj. Op. at 914-15 (quoting Neder, 527 U.S. at 19, 119 S.Ct. 1827). This, the majority explains, is because such testimony, “if credited, would raise a reasonable doubt as to his intent.” Id. But evidence is sufficient to support a contrary finding only if it “could rationally lead to a contrary finding.” Neder, 527 U.S. at 19, 119 S.Ct. 1827. Thus, we must ask whether a rational jury could credit Hunt’s denial of intent to posses cocaine. The majority refuses to ask that question, stating instead that it “cannot conclude beyond a reasonable doubt that a rational jury would not find Hunt credible, especially where Hunt has never had the opportunity to testify,” notwithstanding his conscious choice to plead guilty and to waive trial. Maj. Op. at 915.
This passage ignores the requirement that a defendant must both “contest[ ] the omitted element and raise[ ] evidence sufficient to support a contrary finding.” Neder, 527 U.S. at 19, 119 S.Ct. 1827 (emphasis added); see also id. (requiring the defendant to “bring forth facts contesting the omitted element”). Instead, the majority allows a defendant to meet his Ned-er obligation based on the mere possibility that whatever he would have said at trial might have been credible.[2]
*922 Next, the majority notes that “the contested fact in this case is Hunt’s intent, a fact that is not subject to easy proof like the date of prior removal in Zepeda-Martinez, a fact which was proved through uncontroverted documentary evidence.” Maj. Op. at 914. The implication is that harmless error analysis should be limited to cases where the error concerned an easily provable element. But this is inconsistent with Supreme Court cases which have “repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal,” Washington v. Recuenco, 548 U.S. 212, 218, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006), even where the defendant is deprived of a jury finding on an element, such as intent, which is not easily provable. See, e.g., California v. Roy, 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam) (holding that the failure to instruct the jury that it must find intent to kill in order to convict the defendant of aiding and abetting murder was subject to harmless error analysis); Carella v. California, 491 U.S. 263, 266-67, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (holding that an instruction that foreclosed independent jury consideration of whether the defendant intended to commit theft was subject to harmless error analysis).
Finally, the majority relies heavily on United States v. Jordan, 291 F.3d 1091 (9th Cir.2002), which held that an Apprendi error will not be deemed harmless when a necessary element “is neither charged in the indictment nor proved to a jury beyond reasonable doubt.” Id. at 1097. But Jordan’s exception to harmless error analysis does not apply here because the type of drug Hunt intended to possess was charged in the indictment.
III
Near the end of its opinion, it becomes clear that the majority is not really applying harmless error analysis at all. Indeed, the majority refuses to discuss the strength of the evidence in this case. Instead, it declines to find this Apprendi error harmless for reasons that would apply to any case in which there is an Apprendi error, thereby effectively eliminating harmless error review in such case.
A
The majority reasons that “the plea and sentencing proceedings in this case provide an inadequate record because Hunt’s intent regarding drug type was never litigated.” Maj. Op. at 915. The majority correctly explains that harmless error review “requires us to ‘determin[e] what evidence the parties would have introduced at trial’ had the issue been properly presented.” Id. (quoting Zepeda-Martinez, 470 F.3d at 913 n.3). But it objects that, “[o]n the record before us, it is speculative at best to predict what evidence the parties would have presented at trial,” and thus refuses “to speculate on how a hypothetical trial may have unfolded.” Id.
These objections would apply to almost every appeal in which there is an Apprendi error since, in such cases, the omitted element will almost never have been litigated. Thus, under the precedent established today, a defendant asserting Apprendi error can avoid harmless error analysis simply by pointing out that he did not have the opportunity to litigate the omitted element. Similarly, it is always “speculative” to “determin[e] what evidence the parties would have introduced at trial had the issue been properly presented.” Zepeda-Martinez, 470 F.3d at 913 n.3 (emphasis added) (internal quotation *923 marks omitted); cf. Bryan A. Garner, Modem American Usage 780 (3rd ed.2009) (stating that the subjunctive mood is most commonly used to express states of irreality such as “conditions contrary to fact”). Therefore, while the majority may be uncomfortable engaging in a eounterfactual inquiry, we are under explicit instructions from our precedents to conduct just such an inquiry.[3]
B
The Supreme Court made precisely these points in Neder when it held that the failure to submit an element of a crime to the jury is subject to harmless-error analysis. There, the defendant argued that “[t]o rely on overwhelming record evidence of guilt [that] the jury did not actually consider ... would be to dispense with trial by jury and allow judges to direct a guilty verdict.” Neder, 527 U.S. at 17, 119 S.Ct. 1827 (emphasis omitted). The Neder Court explicitly rejected this argument, noting that “[t]he erroneous admission of evidence in violation of the Fifth Amendment’s guarantee against self-incrimination and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment are both subject to harmless-error analysis,” even though such errors, like Apprendi errors, “infringe upon the jury’s factfinding role” in ways that are “not readily calculable.” Id. at 18, 119 S.Ct. 1827 (internal quotation marks omitted).
The defendant in Neder likewise insisted that, without “an actual verdict of guilty-beyond-a-reasonable-doubt, ... the basis for harmless-error review is simply absent,” requiring the court to speculate about how a hypothetical trial may have unfolded. Id. at 11, 119 S.Ct. 1827 (internal quotation marks omitted). But, again, the Court deemed this concern inconsistent with its cases which have repeatedly applied harmless error review even “where the jury did not render a ‘complete verdict’ on every element of the offense.” Id. at 13, 119 S.Ct. 1827; see also Recuenco, 548 U.S. at 221, 126 S.Ct. 2546 (rejecting the argument that applying harmless error analysis to an Apprendi error would require appellate courts to “hypothesize a guilty verdict that was never in fact rendered” (internal quotation marks omitted)).
If there is one way Apprendi errors differ from other errors to which harmless error analysis applies, it is this: where a sentence is reversed under Apprendi, the government does not have the opportunity to retry the defendant. Accordingly, Apprendi errors often result in convicted criminals receiving windfall sentence reductions. This case exemplifies such windfalls: Hunt’s fifteen-year sentence — imposed chiefly because of his staggering criminal history — is effectively reduced to one year, or, more realistically, to time served.
C
The majority goes on to undermine harmless error review even further by espousing views of the judicial role that are inconsistent with the explicit limits that *924 Congress has placed on appellate review of criminal sentences.
First, the majority categorically proclaims that “[o]ur responsibility is to see that constitutional requirements are met.” Maj. Op. at 917. Congress, however, has directed federal courts reviewing criminal convictions to “give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.” 28 U.S.C. § 2111. This rule, as well as the Federal Rules of Criminal Procedure, requires that we “ ‘disregard! ]’ errors that are harmless beyond a reasonable doubt.” Neder, 527 U.S. at 7, 119 S.Ct. 1827 (quoting Fed.R.Crim.P. 52(a)). Since Congress need not provide criminal defendants with any appellate remedy whatsoever, see Abney v. United States, 431 U.S. 651, 656, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), it is certainly within its power to limit appellate remedies to legal errors that likely affected the result of the proceeding in the trial court. Therefore, we do not have an unqualified “responsibility ... to see that constitutional requirements are met.” Maj. Op. at 917. To the contrary, we have an explicit statutory responsibility to “give judgement ... without regard to [harmless] errors.” 28 U.S.C. § 2111. This includes Apprendi errors. Recuenco, 548 U.S. at 222, 126 S.Ct. 2546.
Second, the majority insists that an Apprendi error is never a “technicality,” and that “[a]voiding what the dissent calls a ‘windfall’ sentence reduction due to an Apprendi error is achieved through a court’s faithful compliance with constitutional requirements, not through appellate review.” Maj. Op. at 917. This ignores the fact that the Supreme Court has applied harmless error review to Apprendi claims and has repeatedly stated that the harmless error doctrine “ ‘serve[s] a very useful purpose insofar as it blocks setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.’ ” Neder, 527 U.S. at 19, 119 S.Ct. 1827 (quoting Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824,17 L.Ed.2d 705 (1967)). Indeed, avoiding a windfall sentence reduction based on a “small error” (or “technicality,” if you will) is the very purpose of the harmless error doctrine. See Shinseki v. Sanders, 556 U.S. 396, 129 S.Ct. 1696, 1705, 173 L.Ed.2d 532 (2009) (“The federal ‘harmless-error’ statute ... seeks to prevent appellate courts from becoming ‘impregnable citadels of technicality.’ ” (quoting Kotteakos v. United States, 328 U.S. 750, 759, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946))). So, while the majority is correct that such windfalls are ideally avoided “through a court’s faithful compliance with constitutional requirements,” faithful compliance with statutory requirements mandates that windfalls must also be avoided “through appellate review.” Maj. Op. at 917.
Last, the majority maintains that “[a] sentence cannot be ‘richly deserved’ under our Constitution if the facts supporting the sentence have not been proven as constitutionally required.” Id. at 916. Yet Congress, under its constitutional power to regulate the federal courts, has directed us to “give judgment ... without regard to [harmless] errors,” 28 U.S.C. § 2111, thereby establishing that a conviction and sentence may still be warranted even if a constitutionally required procedure was not scrupulously followed. Cf. Kotteakos, 328 U.S. at 759, 66 S.Ct. 1239 (stating that Congress passed the harmless error rule to prevent criminal trials from becoming “a game”). “The harmless error doctrine” thus “ ‘recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant’s guilt or innocence.’ ” Neder, 527 U.S. at 19, 119 S.Ct. 1827 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 *925 S.Ct. 1431, 89 L.Ed.2d 674 (1986)); cf. Akhil Reed Amar, Sixth Amendment First Principles, 84 Geo. L.J. 641, 642 (1996) (arguing that “[t]he deep principles underlying the Sixth Amendment,” and “constitutional criminal procedure generally,” are “the protection of innocence and the pursuit of truth”). The majority ignores this principle by vacating Hunt’s sentence despite overwhelming evidence that he committed each of the elements necessary to support it.
IV
The Supreme Court has warned that setting the harmless error standard “so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place.” Id. at 18, 119 S.Ct. 1827. That criticism is that “ ‘[rjeversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.’ ” Id. (quoting R. Traynor, The Riddle of Harmless Error 50 (1970)).
The Neder Court could have been talking about this case. Today, a defendant who has consistently evaded responsibility for his criminal conduct is once again rewarded for his labors. And today, the public sees a criminal who has shown nothing but cruelty to his fellow citizens and contempt for the law escape a richly deserved sentence based on an irrelevant technicality.
I respectfully dissent.

. The majority calls this evidence "circumstantial” and faults the government for not offering evidence that Hunt "looked inside the package to verify its contents.” Maj. Op. at 914. This is an outrageous burden to place on the government, and one which is inconsistent with our long-standing rule that "circumstantial evidence can be used to prove any fact,” United States v. Ramirez-Rodriquez, 552 F.2d 883, 884 (9th Cir.1977), and is no less inherently probative than is direct evidence, Ninth Circuit Model Criminal Jury Instructions § 1.5 (2010). Moreover, intent is almost always proven circumstantially since the only direct evidence of intent is a confession (which, incidentally, the government also presented in this case). See, e.g., Cnty. Court of Ulster Cnty., N.Y. v. Allen, 442 U.S. 140, 164, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (noting that "it is surely rational to infer” from the fact that the defendants were in a car which contained guns "that each [defendant] was fully aware of the presence of the guns and had both the ability and the intent to exercise dominion and control over” them).

. The majority is also impressed by Hunt's claim that he confessed only because that is what the police "wanted to hear.” Maj. Op. at 914-15. But simply attacking one piece of evidence (the confession) with one of the most common means by which confessions are challenged (by claiming that the confessor was just seeking to please his interrogators) is not sufficient evidence to support a contrary finding. Compare United States v. Nordby, 225 F.3d 1053, 1060-61 (9th Cir.2000), overruled on other grounds by United States v. Buckland, 289 F.3d 558 (9th Cir.2002) (concluding that the defendant brought forth evidence sufficient to support a contrary finding on the quantity of marijuana grown on his land by demonstrating that he "had been vacationing for much of the time that the marijuana crop had been in the ground, and only *922 returned to the area five days before being arrested”).

. Put another way, the majority's objection is either that "Hunt’s intent regarding drug type was never litigated,” or that it was never litigated in front of a jury. If it is the latter, then this is the end of harmless error review of Apprendi violations in the Ninth Circuit since such violations only occur where an element of a crime is not "submitted to a jury, and proved beyond a reasonable doubt.” Apprendi, 530 U.S. at 490, 120 S.Ct. 2348. If it is the former, that is, if the majority only objects that the record of Hunt’s intent was not sufficiently developed during the sentencing proceedings, then the proper remedy (contrary to its holding) would be to remand so that the district court can hold a hearing and make a factual finding on whether Hunt intended to possess cocaine.